# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 08-13 Erie |
| ) | |
| JOSEPH MICHAEL GUESS ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McLAUGHLIN, SEAN J., J.

### I. BACKGROUND

The Defendant is charged with the one count of conspiracy to commit wire fraud in violation of Title 18 U.S.C. § 1349, and three counts of wire fraud in violation of Title 18 U.S.C. § 1343. The indictment alleges that the offenses occurred from 2003 through March 2007.

On September 23, 2008, the Defendant filed a motion for a Competency Hearing. This request was based on the contention that the Defendant is presently unable to consult with his lawyer with a reasonable degree of rational understanding because of the effects of a stroke suffered by the Defendant in January of 2007.[1] On April 3, 2009, the Court held a Hearing to address the issues raised in the Defendant's Motion. It is helpful at the outset to make clear what is and what is not in dispute.

There is no dispute that the Defendant's cognition and speech have been affected, to a certain degree, by his stroke. Clinical interviews and a battery of tests were conducted by Neuropsychologists Dr. Marc S. Walter, Ph.D., the Defendant's expert, as well as Dr. Michael Schwabenbauer, Ph.D., who was retained by the Government. The purpose of the interviews and testing was to assess the Defendant's present ability to adequately consult with his lawyer with a rational degree of understanding. The test results generated by each expert were in many respects quite similar. The experts disagreed, however, as to their meaning relative to the core issue of the Defendant's competency. In addition, the experts drew different conclusions relative to

---

[1] The Defendant concedes that he possess a rational and factual understanding of the charges against him.

1

competency based on the clinical interviews each conducted with the Defendant.

Organizationally, I will first summarize the controlling case law or legal standards that will be applied in passing upon the Defendant's competency. Thereafter, I will provide a summary of the material facts which were established, to my satisfaction, at the Hearing. Finally, I will set forth the reasons for my conclusion that the Defendant is competent to stand trial.

## II. Discussion - The Law

"Fundamental to our adversary system of justice, and perhaps especially of criminal justice, is the prohibition against subjecting to trial a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." United States v. Renfroe, 825 F.2d 763, 765 (1975). Clearly, the conviction of a legally incompetent defendant and the failure to provide adequate procedures to determine competence violate a defendant's constitutional right to a fair trial. Id. at 765-66.

The mere fact that a defendant suffers from a mental illness does not mean that the defendant is thereby incompetent to stand trial. See United States v. Leggett, 162 F.3d 237, 244 (3d Cir. 1998)(citing cases). Rather, "[i]n Dusky v. United States, 362 U.S. 402 (1960), the Supreme Court defined the test for competence to stand trial as whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." Renfroe, 825 F.2d at 766. Congress has since codified this standard in the comprehensive Crime Control Act of 1984, P.L. 98-473, 18 U.S.C. Section 4241, which provides in part, as follows:

> (d) Determination and disposition.-If, after [a competency] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General [for hospitalization at a suitable facility]. ...

18 U.S.C. § 4241.

When evaluating a defendant's competency, a district court must consider a number of

2

factors, including "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." Leggett, 162 F.3d at 242 (quoting Drope, 420 U.S. at 180). Other factors that may be relevant to the determination "include an attorney's representation about his client's competency ... and a showing of narcotics abuse." Renfroe, 825 F.2d at 767 (internal citation omitted). "All of these factors must inform the statutory requirement that a defendant be able to understand the nature and consequences of the proceedings against him and be able to assist properly in his defense." Id. Determining a defendant's competency is "often a difficult [question] in which a wide range of manifestations and subtle nuances are implicated." Drope, 420 U.S. at 180.

"The test must be whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." Dusky, 362 U.S. 402. "The mere fact that someone suffers from a mental disease or defect is not in and of itself dispositive:

> It does not follow that because a person is mentally ill [that person] is not competent to stand trial. United States v. Davis, 93 F.3d 1286, 1290 (6th Cir. 1996) (quoting Newfield v. United States, 565 F.2d 203, 206 (2d Cir. 1977)); see also United States v. Nichols, 56 F.3d 403, 412, (3d Cir. 1988) ("It is well established that some degree of mental illness cannot be equated with incompetence to stand trial.") (internal quotation marks and citation omitted) ... If the mental illness does not 'deprive the defendant of the ability ... to understand the proceedings ... rationally as well as factually,' Nichols, 56 F.3d at 412 (citation omitted), then the illness is irrelevant for the purposes of determining competency.

United States v. Kosow, 2007 WL 3033774 at *11 (W.D.Pa. 2007).

As the court observed in United States v. Hogan, 986 F.2d 1364, 1368:

> Even perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency.

### THE TESTIMONY

Dr. Walter concluded, based on his review of the medical records, that the Defendant sustained an acute infarction of the middle brain, which impacted on motor function and speech. (Tr. p. 8). He administered the Aphasia Screening Test, which involved reading, spelling and simple math, command following and copying figures. The Defendant tested in the average

3

range on that test. (Tr. p. 11). On the Controlled Oral Word Association Test, (COWAT Test), which involved generating as many words as possible from the letters of the alphabet in 60 seconds, he scored in the impaired range. The Digital Symbol Coding Test was administered, which involved copying symbols below numbers, and a finding of borderline impaired was made. Significant impairment was found on two of the visual aptitude tests. (Tr. p. 13). On the Wechsler Memory Scale Revised Test, Dr. Walter concluded that his immediate and delayed recall were average. This test involved reading the Defendant a story and then asking him about the content. (Tr. p. 14). The Hopkins Verbal Learning Test reflected impairment. Dr. Walter concluded that his verbal memory was average. (Tr. p. 16). He found him to be low average on the visual memory test involving simple and complex designs. As to his abilities relative to visual and verbal memory, Dr. Walter responded to the Court's question as follows:

> THE COURT: Let me ask the question this way. I'm trying to understand qualitatively the difference between the drop off between his visual performance and his memory performance. You said in your view he did more poorly on the visual recall, yet I'm having some difficulty understanding, it sounded to me like they both were both low average, maybe that's not right?
>
> THE WITNESS: Yes, let me go at that again. There were two tests that I did in the verbal memory area, that was the test that had two short stories, he was average on that, immediate and delayed. The other test was a word list. And he was impaired both immediate and delayed on that one. On the visual memory test, on both the simple and complex designs at a delay he was low average to borderline. Some he was -- he was not terrible in those, but we did see a significant drop off. So he's worse, I think overall he's probably worse at visual memory than he is in verbal memory.

(Tr. p. 17). Dr. Walter concluded that he tested in the low average to borderline range for delayed visual memory. (Tr. p. 18).

Dr. Walter also administered the Wechsler Adult Intelligence Scale Third Addition, which was comprised of five or six subparts. (Tr. p. 20). The Defendant's full scale IQ was 91, which placed him in the average range. His verbal comprehension was 96, which also was average. (Tr. p. 21). His working memory index score of 94, which involved letter and number sequencing, was average as well. (Tr. p. 21). Dr. Walter concluded that despite his cerebral accident, the Defendant was of "at least average intelligence." (Tr. p. 23). With respect to his performance on the COWAT and Wisconsin Card Sorting Test, he made the following finding:

4

>And in this case he made 28 perseverations, which was in the mildly impaired range, but was definitely impaired. He was also mildly impaired in terms of his overall conceptual level. His overall looking at how many he got right and so on, he was 47.7 percent, which is a little bit low, I'd say that's mildly impaired as well. He got four out of six of the categories, which is low average, that's not too bad.

(Tr. p. 30).

Dr. Walter testified that the Defendant was able to complete the Stroop Test without error, but that it took him "89 seconds, which is mildly impaired." (Tr. p. 31).

The following questions and answers were elicited relative to the extent to which the Defendant's executive functioning had been impaired:

>Q. Can you explain to the judge what is executive function, what do you mean when you use that term?
>
>A. It is higher level reasoning and it involves abilities like planning, organization, learning from experience, self-awareness. Control, self-control, control over impulsivity, that kind of thing. It reflects functioning of the frontal lobe and that part of the brain directs the rest of the brain, what to do at least consciously, as far as we understand it.
>
>Q. So your testing shows that Mr. Guess's executive functioning is impaired?
>
>A. Correct.
>
>THE COURT: Qualitatively, how so, I mean impaired is a big universe, it can be mild impairment, moderate impairment, severe impairment, did you characterize it or did you have an opportunity to characterize it in your report?
>
>THE WITNESS: If I look at the T-scores, it's mild. The T-scores range from 30 on the COWAT, up to 39 on Trails B. So that whole category of 30 is right at the edge of the moderate range.

(Tr. p. 33).

Dr. Walter described an instance where the Defendant became quite upset when discussing the charges, noting that his face became quite red. (Tr. p. 37). He described it as a catastrophic reaction that can be typical in some stroke victims. (Tr. p. 98). While I find that the event occurred, I do not find that the Defendant's emotional reaction witnessed by Dr. Walter materially interferes with his ability to rationally assist in his defense.

Dr. Walter was also questioned concerning the Defendant's hospitalization immediately

5

after his stroke. He indicated that the records reflected that the Defendant was admitted to the hospital on January 19, 2007 and discharged on January 21st. The medical records confirmed that he was not discharged to a rehabilitation center or to a nursing home for follow-up care, but discharged to home. No post-discharge rehabilitation was ordered. (Tr. p. 45).

Dr. Walter summarized the basis for his conclusions that the Defendant lacked the competence to proceed to trial as follows:

> A. As evidenced by the neuropsychological impairment, as evidenced by his behavior problems, and consistent with information from you and his wife that this behavior was not just put on for my benefit, but it actually is a daily event. And, also, the fact that he does have documented brain damage on MRI. So that in fact he probably has had at least two major strokes and perhaps many other strokes. Or some other condition which has caused his brain to atrophy. All of those go into my decision.

(Tr. p. 43).

For reasons which will be discussed more fully below, I do not credit Dr. Walter's opinion that this Defendant lacks the competency to stand trial.

Cindy Guess, the Defendant's wife of 28 years, was called by the Defendant. She testified that after the stroke the Defendant frequently responded to her questions by stating, "I don't know." (Tr. pp. 75-76). She also testified that he becomes quite upset and angry when she asks him to further explain himself. While I conclude that she did observe some diminution in her husband's cognition and ability to express himself, I find the severity of those changes or difficulties were somewhat overstated. By way of example, Mrs. Guess's recollection that the Defendant almost invariably responded to questions by stating, "I don't know," is belied by the quality of his test results and his ability to meaningfully interact and respond to questions during Dr. Schwabenbauer's clinical interview. Moreover, I credit Dr. Schwabenbauer's observation that the Defendant is able to regain his composure after an episode of emotional upset.

As previously indicated, Dr. Schwabenbauer was called by the Government. He agreed that the Defendant had sustained a left hemisphere stroke as reflected on the MRI. (Tr. p. 104). He testified that the Defendant was able to provide a detailed personal history to him. He concluded that although the Defendant had suffered some changes as a result of his stroke, he was "clearly able" to explain "his position, his background, and his feelings." (Tr. p. 110). He

6

noted that occasionally there would be a slight pause of a second or two, before he would answer the question, which he considered typical of stroke patients. (Tr. p. 110). He observed, however, that the occasional pauses to search for the right word did not hamper his interview. (Tr. p. 111).

Dr. Schwabenbauer found no signs of fabrication as a result of the stroke. (Tr. p. 114). Dr. Schwabenbauer testified that the Defendant told him that he was charged because he was the middleman and they wouldn't tell him who the victims were. He also indicated to Dr. Schwabenbauer that he was charged because he wouldn't meet with the authorities. (Tr. p. 115). Dr. Schwabenbauer also noted that the Defendant lamented that he would have hired a private attorney if he had the money. (Tr. p. 115). He relayed an instance where the Defendant became quite upset when the term "scheme" was used. In response, the Defendant countered that it was a viable business. (Tr. p. 116). After the Defendant became visibly upset, however, Dr. Schwabenbauer observed that he was able to walk to the window and regain his composure. (Tr. p. 118).

The following testimony was elicited from Dr. Schwabenbauer concerning the quality of the Defendant's interaction with him during the clinical interview:

> Q. Okay. Now, from a psychological standpoint, we're going to get into the testing in a moment, but I want you to talk about this clinical interview. With regard to the defendant's ability to communicate to you in detail about his social and employment and educational experience, what did you glean from that from a forensic psychological examination standpoint?
>
> A. Couple of things. First, that he clearly understood what I was asking him and he responded appropriately. He gave what seemed to be a very accurate and concise social history. Also, that his long-term memory was quite intact, he was able to pull information on request and describe in an accurate and fairly sequential manner the details of his life in the past.
>
> Q. In addition to the content of the clinical interview with regard to his history, what do you glean from a psychological standpoint about his insight into the impact that this case has had on him and the stressors that he's feeling?
>
> A. Well, he clearly conveyed an understanding of his current situation. That he had quite adequate insight into what had been happening, what had been going on. He clearly presented it as being very frustrating, emotionally stressful. But he clearly understood his situation at this point.
>
> Q. From the standpoint of the impact of the stroke on him, is his

> ability to communicate with you about social employment and educational history, as he was able to give you insight about how he was feeling, does that impact you from the standpoint of the final determination that we will get to concerning his competence?
>
> A. Yes, it does.
>
> Q. Why, just from a practical standpoint, why are those things important?
>
> A. Because an individual's insight, appreciation or even appraisal of their situation, is key in terms of understanding how significant the perceived brain injury or problems associated, cognitive and emotional and so on, are going to impact on that individual's day-to-day functioning. If they're aware of it, they compensate for it and deal with it and try to improve the circumstances of their situation. If they're not aware, as you see with other types of brain injury, the ability to treat them and help them is almost futile because of their lack of understanding and insight of what's wrong.

(Tr. pp. 118-120).

  Dr. Schwabenbauer testified that he was "very accepting" of the results obtained by Dr. Walter on the WAIS-III battery of tests. He did repeat, however, the Digital Symbol Subtest and concluded that the Defendant scored very similarly, (i.e., in the moderately impaired range), to how he had scored on the test which was administered by Dr. Walter. (Tr. p. 125). He also administered a test that assisted in determining the extent of any problem with comprehension and verbal expression. In both the Boston Diagnostic Aphasia Exam and the Minnesota Differential Test of Aphasia, Dr. Schwabenbauer found the Defendant's performance well within normal limits. (Tr. p. 126). With respect to the Boston Diagnostic Test, which tests "more active comprehensive measures," Dr. Schwabenbauer concluded that the cognition regions of the brain were functioning quite adequately. (Tr. p. 127). The Defendant scored in the 66th percentile in listening cognition, which is average. (Tr. p. 131). He scored in the 84th percentile, on oral expression, which represents the superior range. His written expression reflected mild to moderate impairment. With respect to reading comprehension he was mildly impaired. (Tr. p. 132). Dr. Schwabenbauer observed that there was no breakdown in communication when complex phrasing was utilized. (Tr. p. 135). He found his verbal memory to be somewhat more impaired than visual memory. (Tr. p. 137).

  Dr. Schwabenbauer was questioned as to the basis for his conclusion that the Defendant

is competent to stand trial and gave the following responses:

> Q. As a result of your conducting the battery of psychological testing and your review of Dr. Walter's report and the medical reports, were you able to come to a conclusion to a reasonable degree of psychological certainty as to whether this particular defendant is competent to stand trial and, more particularly, whether or not he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, which is really the only prong that seems to be at issue here?
>
> A. Yes, based on my test results, the interview and the record review, it was my opinion that he clearly is competent at this point. He clearly is aware of the charges against him, has an adequate grasp of it and can participate in his defense.
>
> Q. Now, at times you made mention of him being borderline moderately impaired as to certain testing factors?
>
> A. Yes.
>
> Q. Why is it that Judge McLaughlin should not take from that, that because he is moderately impaired in any area, that he is therefore incompetent from a psychological standpoint?
>
> A. Well, because it's a considerable, it's a much different question that is asked when one is interested in competency, as opposed to brain impairment. Many people have brain impairment, some more severe than others, and we can't equate brain impairment with someone who is incapacitated. Many people who have severe memory problems, because they're aware of those and compensate for them, are quite competent to make their own decisions and live their lives as a result. The key factor here I think is not so much the brain injury, as it is his general awareness of the situation, as well as his limitations.
>
> Q. And in areas where you also agree that there may be limitations, are those limitations that you were able to even overcome in the course of your clinical interview with regard to Mr. Guess?
>
> A. Yes, particularly in terms of his comprehension and his language limitations, it was quite easy to work through those and communicate with him throughout the interview and the testing procedures. He certainly demonstrates an emotional dyscontrol at times, which again may be directly related to his stroke. But, again, it passes quickly and he's then able to process information again at that point. So it's not anything of a long-term nature.

(Tr., p. 141-142).

Finally, Dr. Schwabenbauer noted that an audiotape of a recorded conversation between

9

the Defendant, his co-defendant and another individual further buttressed his conclusion that he could adequately assist his defense counsel.[2] (Tr. p. 144).

Here, after a careful review of the testimony and exhibits, as well as my observations of the demeanor and conduct of the Defendant at the Hearing, I conclude by a preponderance of the evidence[3] that the Defendant possesses the present ability to consult with his lawyer with a reasonable degree of rational understanding.

First, I note that the uncontradicted medical evidence demonstrates that the stroke suffered by the Defendant was mild. After his hospital stay, no further follow-up therapy was scheduled. I also credit Dr. Schwabenbauer's conclusion that his long-term memory remains firmly intact, including the period of the alleged conspiracy. While there is no question that the stroke has produced some impairment of cognition and speech, I find that the record overwhelmingly supports the conclusion that the residual effects from the stroke are quite mild.

I also find it significant that Dr. Schwabenbauer was able to meaningfully discuss the charges with the Defendant during his clinical interview and the Defendant was able to offer explanations as to his role. He was an accurate historian and was able to succinctly relate to Dr. Schwabenbauer his social history. On balance, Dr. Schwabenbauer found his ability to communicate quite adequate, albeit somewhat slowed on occasion when searching for the right word.

---

[2] The Court listened to the audiotape as well. Although the Defendant was not at actively engaged as the others on the tape, his comments and responses lend further support to a finding of competency.

[3] It appears that 18 U.S.C.A. § 4241(d) expressly places the burden of proof upon the party seeking to establish the defendant's incompetency - in this case, the defense. Moreover, in Cooper v. Oklahoma, 517 U.S. 348, 362 (1996), the Supreme Court stated in dicta that "Congress has directed that he accused in a federal prosecution must prove incompetence by a preponderance of the evidence." (citing 18 U.S.C. § 4241). The Defendant argues that it is the government's burden to establish competency by a preponderance of the evidence. See United States v. Askari, 222 Fed.Appx. 115, 119 2007 WL 1073698 at **4 (3d Cir. April 11, 2007). The Third Circuit Court of Appeals has not squarely addressed this in a published, precedential opinion since Cooper was decided. Furthermore, the language in Askari suggesting that the burden of proof remains on the government is also dicta. For present purposes I will apply the language of the statute and assume the defense has the burden of proof; however, I also note that, even if the burden were placed upon the government, the result of these proceedings would be the same.

I also credit Dr. Schwabenbauer's observation that he is able to control his periods of emotional upset (which may well be caused by a combination of residuals from the stroke and the likely stress of the pending charges).  Dr. Schwabenbauer's opinion that the Defendant has retained a degree of self-awareness of his limitations and developed coping skills further buttress my conclusion relative to the Defendant's competence.

In sum, I find Dr. Schwabenbauer's opinion that the Defendant is competent to stand trial more persuasive than Dr. Walter's opinion to the contrary.  Dr. Schwabenbauer's conclusion finds support in the quality of the Defendant's performance on the battery of tests, as well as his ability to effectively communicate in his clinical interview.

My conclusion that the Defendant is competent of proceed to trial is also based, in part, on my observations of the Defendant at the Hearing.  He was composed throughout, attentive, and closely followed the flow of the proceedings.  His interaction with his defense counsel seemed entirely appropriate.

I close with a final observation.  The mere fact that a defendant is not at the top of his "mental game" does not per se render the defendant legally incompetent under the previously-described case law.  Rather, a defendant's mental defect must be viewed on a sliding scale of severity, which necessarily permits some diminution in capability without triggering a finding of incompetence.  Perfection is not required.  In my view, the record amply supports the conclusion that this Defendant has not slid so far on that scale that his trial would offend fundamental notions of due process.  I find the Defendant competent to stand trial.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 08-13 Erie |
| | ) | |
| JOSEPH MICHAEL GUESS | ) | |

## ORDER

AND NOW, this 1st day of July, 2009, and for the reasons set forth in the Findings of Fact and Conclusions of Law, I find that the Defendant, Joseph Michael Guess, is capable of consulting with his lawyer with a rational degree of understanding and is competent to stand trial.

                                                  s/ Sean J. McLaughlin
                                                  United States District Judge

cm: All parties of record.